UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN RE:  NUVARING PRODUCTS            )
LIABILITY LITIGATION                 )
                                     )Case No. 4:08-MD-01964 RWS
                                     )


STATUS HEARING
BEFORE THE HONORABLE RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE
JULY 13, 2011


APPEARANCES
For Plaintiffs:        Kristine Kraft, Esq.
                       Roger Denton, Esq.
                       Megan Vanderbeek, Esq.
                       SCHLICHTER AND BOGARD
                       100 S. Fourth Street, Suite 900
                       St. Louis, MO  63101

For Defendants:        Melissa A. Geist, Esq.
                       Thomas Yoo, Esq.
                       REED SMITH, LLP
                       136 Main Street, Suite 250
                       Princeton Forrestal Village
                       Princeton, NJ  08540


(Appearances continued on page 2)

REPORTED BY:           SHANNON L. WHITE, RMR, CRR, CSR, CCR
                       Official Court Reporter
                       United States District Court
                       111 South Tenth Street, Third Floor
                       St. Louis, MO  63102
                       (314) 244-7966
          PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED:


For Defendants:        Dan H. Ball, Esq.
                       Stephen Strauss, Esq.
                       BRYAN CAVE, LLP
                       211 N. Broadway, Suite 3600
                       St. Louis, MO  63102

1           **(PROCEEDINGS STARTED AT 10:35 AM.)**

2         THE COURT: Good morning. We're here this morning in

3 the case styled *In re: NuvaRing Products Liability*

4 *Litigation*, Cause No. 4:08–MD–1964. Would counsel make their

5 appearances, please?

6         MR. DENTON: Good morning, Your Honor. Roger Denton,

7 Kristine Kraft, and Megan Vanderbeek from my office for the

8 plaintiffs.

9         MS. GEIST: Morning, Your Honor. Melissa Geist from

10 Reed Smith for the defendant.

11         MR. BALL: Dan Ball, Bryan Cave, for defendants.

12         MR. YOO: Thomas Yoo also for defendants.

13         MR. STRAUSS: Steve Strauss also for the defendants.

14         THE COURT: Very good. We are here today on a

15 prescheduled or scheduled status conference. I have the

16 recommended agenda items from the parties, so we'll take them

17 in order unless there are any announcements before we get

18 started.

19         Ms. Geist? Ms. Kraft?

20         MS. KRAFT: No announcements.

21         MS. GEIST: No, Your Honor.

22         THE COURT: All right. Ms. Kraft, from your filing

23 we have, No. 1, deadline for defendants to supplement

24 discovery responses, including updated custodial files.

25         MR. DENTON: If I can?

```
 1              THE COURT:  Mr. Denton, all right.

 2              MR. DENTON:  Good morning, Your Honor.

 3              THE COURT:  I assumed Ms. Kraft was in charge.  I

 4    apologize.

 5              MR. DENTON:  She has always been in charge, Your

 6    Honor, but I ran over here early and had a discussion with Ms.

 7    Geist and Mr. Ball to try to put some definition of this

 8    issue.

 9              From our perspective, Your Honor, we believe, and the

10    Court has previously indicated the obvious, that the federal

11    rules require the defendant to make reasonable supplementation

12    of discovery to bring it current and up to date.  Defendants

13    have not, obviously disagreed with that, but the issue is the

14    timing and how we're going to get all this done, given the

15    fact that we're working on expert reports right now and

16    there's ongoing activity on this product.

17              We discussed some mechanism shortly before the

18    hearing that may lead us to a resolution of this, although I

19    have some concerns about the timing.  For example, one of the

20    big concerns I have, there is an ongoing safety study that the

21    company is sponsoring and paying for, and they send periodic

22    reports.  We have not had a report on that, I believe, since

23    December of 2010.  We know they had a meeting in June, a

24    committee meeting, and we believe they've recently

25    corresponded some of this information to the FDA and probably
```

1    the European regulators.  We haven't seen it yet.  They're not

2    disputing we're going to see it.  My concern is when, in light

3    of the fact that our expert reports are due in a couple of

4    weeks and depositions will take place, and I'm trying to avoid

5    a situation that additional information comes out after our

6    experts are deposed and then they will need to supplement

7    reports in supplemental depositions.  I'm trying to avoid some

8    of that and that's my concern, and that's just an example.

9    And we're trying to see if we can work this out after the

10   hearing, but I'm not sure yet if we're going to be able to do

11   that.  So that's basically the situation.

12              THE COURT:  So you're cautiously optimistic but

13   afraid?

14              MR. DENTON:  I'm not sure I'm any of those, Your

15   Honor, but --

16              THE COURT:  Fearful.  Maybe "afraid" is too strong.

17   Fretting.

18              MR. DENTON:  No.  What I'm really trying to do is

19   save all of us some time and money in trying to do this as

20   efficiently as we can on both sides.

21              THE COURT:  Right, I mean, because this isn't the

22   kind of thing I can be involved in on a regular basis.

23              MR. DENTON:  Correct.

24              THE COURT:  Ms. Geist, do you have anything to add to

25   that?

1    MS. GEIST:  Thank you, Your Honor.  Nothing much more

2    than what Mr. Denton already said; although, I am certainly

3    optimistic, Your Honor, we are going to work this out.  We

4    talked about timing.  We talked about starting our

5    supplementation of the custodial and other files consistent

6    with the federal rules, beginning middle of August.  We would

7    complete that in the fall, and then we would do the process

8    again in February for further updating.  So the parties, I

9    think, Your Honor, are going to be able to work this out.

10    THE COURT:  I mean, Mr. Denton has this -- it's the

11    fear of the unknown, not that he's afraid, but there's the

12    fear of the unknown that is always a problem.  It's usually

13    the fear of the unknown is greater than the reality.  You

14    actually have a better idea about what we're talking about.

15    I mean, you understand that the pressures on the

16    parties and the court to continue to move forward are

17    substantial, and one of the things that can most likely create

18    a detour is that these studies provide a substantial amount of

19    new information or it's substantially substantive information

20    between your client and the FDA that does cause us to have to

21    stop, supplement experts' reports and do expert depositions

22    again, which nobody wants to do.

23    MS. GEIST:  Certainly, Your Honor.  And with respect

24    to the studying question, that is, the TASC study, we --

25    keeping these points in mind that the Court just made, we have

1   continued to supplement with respect to the TASC study on an

2   ongoing basis.  I believe we are essentially current, Your

3   Honor, as to the TASC study.  Mr. Denton is correct.  There

4   was a meeting in June.  There was a very recent, over the last

5   week or two, submission to FDA for an interim report on the

6   TASC study, and we would certainly be providing that to

7   plaintiffs' counsel by mid August, if not before.

8           THE COURT:  Because you uniquely know if this is the

9   kind of information that's really going to have an effect or

10  it's like, well, we kind of knew all that.  We just got to

11  keep going forward.

12          MS. GEIST:  Part of the discussion that we had, Your

13  Honor, too, is to assist plaintiffs' counsel so I'm not the

14  only person who knows the types of documents we're talking

15  about.  We're happy to provide counsel with a list of the

16  current custodians for whom we'll be supplementing and the

17  different databases, the centralized databases that we'll be

18  supplementing as well, just so we're all on the same page.

19          THE COURT:  Mr. Denton, are you okay with that so

20  far?  Do you remain optimistic?

21          MR. DENTON:  I remain optimistic so far, Your Honor.

22          THE COURT:  All right.

23          MR. DENTON:  But we're going to talk after the

24  hearing.

25          MS. GEIST:  Yes.  Thank you, Your Honor.

```
 1              THE COURT:  All right.  Both parties have on their

 2   agendas the stipulation regarding Rule 26 and that it should

 3   apply to experts in this case, the new rule.

 4              Mr. Ball?

 5              MR. BALL:  This was a topic of discussion when we

 6   were here in May.  After that, the parties reached a

 7   stipulation.  I prepared a order for presentation to the Court

 8   and found out that I had a typographical error in it, so we

 9   will be submitting that.  We can submit that to you

10   electronically later today.

11              THE COURT:  It's one of the few places people still

12   have Wite-Out, you know, for jury instructions, you get

13   halfway though an instruction and realize that something is

14   wrong and you don't want to stop and leave while the jury's in

15   the box.  So I still have Wite-Out around if that will solve

16   the problem.

17              MR. BALL:  I think it would be easier if I just get

18   it typed and submitted later today.  There is no controversy

19   about it.  The parties have agreed that the 2010 amendments to

20   Rule 26 as they pertain to experts will apply to all the cases

21   in the MDL and, in fact, all of the pending NuvaRing

22   litigation.  So that's where we are in that issue.

23              THE COURT:  All right.

24              MR. DENTON:  Yes, Your Honor.  The plaintiffs agree

25   to that.
```

1        THE COURT:  All right.  Moving on to then Ms. Geist's

2   submission.  The first one was the Rule 26.  Second was

3   stipulation regarding depositions after the exchange of trial

4   witness lists.

5        MR. BALL:  Yeah.  I had -- the same proposed order I

6   just spoke of also includes that as a stipulated order that

7   we'll present to the Court later today.  Essentially what the

8   parties have agreed to is what was discussed at the hearing in

9   May and, that is, that 60 days before the trial date the

10   parties will exchange reasonable and good faith witness lists.

11   And if there's a witness on there that has not been deposed,

12   then the parties agree that they will make that witness

13   available within the next 30 days for a deposition so that

14   we -- part of the purpose of this was so we're not taking

15   unnecessary depositions, but we're also avoiding surprise.  So

16   the parties have worked that out, and it will be a part of the

17   stipulated order that except for the typo, Mr. Denton has

18   signed off on.

19        THE COURT:  Okay.  Defendants' motions to enforce

20   compliance with court order regarding contention

21   interrogatories and trial pool cases.

22        MR. YOO:  Morning, Your Honor.

23        THE COURT:  Mr. Yoo, how are you?

24        MR. YOO:  I'm good, thank you.

25        We, on July 1, filed, I believe, seven motions

1   relating to the Court's order from back in December of 2010.

2   The plaintiffs' opposition was due, I believe, on July 8.

3   Instead of filing an opposition, they filed a motion seeking

4   additional time to respond to the motion and suggesting that

5   they would get that on file mid August, about two weeks after

6   their expert reports are due.

7          I'm not sure how the Court wants to deal with that

8   today, but from our perspective, this relates to basic

9   discovery that was propounded back in April of 2010 when

10  case-specific discovery got started.  Your Honor will recall

11  that we had some issues with the vagueness of the pleadings.

12  I thought the parties were in agreement with the Court that

13  case-specific discovery would be the time to discover the

14  plaintiff-specific facts and bases for everyone's claims, so

15  we started by propounding discovery directed at those issues.

16         The initial response from the plaintiff was, we're

17  not going to respond, period, because you have plaintiff fact

18  sheets.

19         We had to file a motion to compel responses.  The

20  Court, in December of last year, granted the motion and

21  ordered plaintiffs to provide responses I believe on a

22  staggered basis, with responses being due in January and

23  February.

24         We then got responses which essentially are not

25  factual, they don't contain any evidence, it's just conclusory

1  allegations, number one; and number two, they're virtually

2  identical conclusory allegations across all seven plaintiffs'

3  firms, across all of the trial pool plaintiffs.  That simply

4  cannot be.

5        From our perspective, it has basically made a mockery

6  of the discovery that was propounded and is not compliant with

7  the Court's order.  We attempted meet and confers.  Those were

8  not successful, so we had to file a motion.

9        It's pretty clear to us that what's going on here is

10  plaintiffs don't want to provide the factual evidence

11  supporting each of the trial plaintiff's claims.  They have

12  told us in their discovery response and have pretty much said

13  it again in their motion to extend their time to respond that

14  they don't want to provide this information; rather, we should

15  just wait and read their expert reports.

16        That's problematic for us on many levels.  That's,

17  number one, not compliant with the rules.  Number two, it's

18  not fair to us.  As I think Your Honor can appreciate, expert

19  discovery can be a little bit tricky.  Experts are allowed

20  leeway.  They're obviously offering opinions.  We need to know

21  going in to expert discovery whether there's a factual basis

22  or not.  Plaintiffs have made a deliberate attempt here, I

23  think, to not provide us those factual bases.

24        So we are in a situation where we were entitled to

25  this information about a year ago, we have already gone

1    through motion practice, we've now had to file a second set of

2    motions, we don't have resolution, we have no factual

3    information on a plaintiff-specific basis.  I will also add

4    that this week we had to file another wave of motions related

5    to a subsequent set of similar type of discovery that was

6    propounded, requests for admissions with attendant

7    interrogatories and requests to produce.  The request for

8    admissions went something like:  Admit that you have no

9    evidence that your NuvaRing that you used --

10          THE COURT:  I read them as contention requests for

11    admissions.

12          MR. YOO:  That's right.  And we don't have any

13    information there either.  We got the same response, which is:

14    Read our expert reports; it will be in there.

15          We think fundamentally that's defective, that's not

16    compliant with discovery obligations, that's not compliant

17    with the Court's order.

18          So at this point, I'm not sure what the best remedy

19    is.  We just want to know what the factual bases are on a

20    plaintiff-specific basis.  This relates only to the trial pool

21    plaintiffs.  We should have had that information a long time

22    ago.  We would like it immediately.  We would like it before

23    we get plaintiffs' expert reports.

24          MR. DENTON:  Thank you, Your Honor.  First of all, we

25    have not yet had a chance to file a written brief, and we

1   believe our answers are appropriate.  We find it odd that if

2   the defendant got our answers in January and February, they

3   just now bring it to the Court right after the 4th of July

4   holiday, while we are in the process of working day in and day

5   out to get these expert reports done in July, and it really is

6   a burden.  But the motion isn't ripe yet.  We have a right to,

7   and we'd request the right, to respond.

8           The same goes for the motion on the contention

9   requests for admission.  That motion, I think, was just

10  filed -- it was filed on the 12th.

11          THE COURT:  Yesterday.

12          MR. DENTON:  Yesterday.  So we clearly haven't had an

13  opportunity to respond to that.  But we have a fundamental

14  disagreement, without waiving other arguments that we will

15  brief, that, A, these are not general -- that there's somehow

16  case-specific issues.  I think there are, but many of these

17  issues, Your Honor, whether the products are defective,

18  whether the products are designed defective, whether or not

19  the label is adequate, whether or not there was

20  misrepresentations to the regulatory bodies, and a list of

21  issues are generic and general to all plaintiffs.

22          To say that a particular plaintiff or particular

23  doctor is unique or different than all doctors on some of

24  these points, is inappropriate and probably nonexistent.

25          Clearly, we are required and will set forth very

1    detailed bases for any opinions of any experts, and that will,

2    in large part, give the defendants what they need.

3         The other thing, Your Honor, is the so-called

4    contention interrogatories that say something like this:

5    Please admit you have no evidence of basically our entire

6    case.

7         I guess we could, in response, file a request to

8    admit and admit you have no evidence that you properly warned

9    any particular doctor in the United States.

10        It seems to be that that's not the type of fact that

11   the rule contemplates.  If there is a specific fact or a

12   specific document, that's one thing, but to basically say,

13   admit you have no work product -- I mean, it is our work

14   product -- or to admit you have no evidence, we don't think is

15   proper under the rules, and we'd like to offer you some case

16   law in that regard in response to this.  In large part this is

17   going to be a moot issue in my mind.  Our reports are due

18   August 1?

19        MS. KRAFT:  Right.

20        MR. DENTON:  August 1.  And we intend and we'll make

21   that deadline.

22        The other thing, Your Honor, is discovery is ongoing.

23   There's no way that we're going to be able to, for example, on

24   the safety studies say we know all the evidence at this point.

25   The evidence is ongoing, and the defendants have stood up

 1  today and told you, as of this time, there's evidence that we

 2  have not yet had.  I'm not faulting them for not giving us the

 3  evidence yet, but then to turn around and say, tell us every

 4  piece of evidence you have that supports an issue, we think is

 5  inappropriate.

 6          So our view is, these are not ripe for judicial

 7  resolution, we will respond if needed, and intend to, and then

 8  the Court can tell us in its order what we should be doing,

 9  but we believe there is no surprise here.  They know what the

10  issues are.  They've attended the depositions.  They certainly

11  will know our positions when they get our expert reports in

12  15, 16 days, something like that.  I may have the math wrong.

13  Eighteen days maybe.  And that's generally where we're at.

14  Thank you, Your Honor.

15          MR. YOO:  Your Honor, from what I just heard from Mr.

16  Denton, I mean, that's an argument against contention

17  discovery in general.  It's an argument against fact discovery

18  as opposed to expert discovery.  I don't think there's any

19  basis for that.  We're entitled to this information.  We asked

20  it at the beginning of case-specific discovery, and they have

21  apparently done a successful job of not giving it to us until

22  now.  And I just heard Mr. Denton tell the Court again that

23  they don't want to do this; that it's moot because it will be

24  in the expert reports.

25          Obviously, the experts, before they can give an

1   opinion in a specific case, has to consider the facts and the

2   bases for the claims.  So they're presumably providing the

3   experts with something.  They should be giving that to us.

4   They should have given it to us already in fact discovery.

5          The argument that the cases are all pretty much the

6   same, I just don't think that gets out of the gates.  We're

7   talking about stroke cases, pulmonary embolism cases, DVTs,

8   plaintiffs in their twenties, plaintiffs in their forties,

9   plaintiffs who used the product for a month, plaintiffs who

10  used it for three years.  How could it be identical across all

11  cases?

12          Let me give you one example.  Our discovery asked:

13  Set forth all facts and bases that support your contention

14  that your alleged injury was caused by your use of NuvaRing.

15          Answer.  This is across all plaintiffs and all firms.

16  Plaintiffs medical records -- excuse me.  Plaintiff's medical

17  records, medical literature on VTE.  Note, it is also expected

18  that experts whom plaintiffs hired hereafter will give support

19  on causation.  What are we supposed to do with that?  That

20  isn't fact discovery.  And that's in no way complying with

21  this Court's December 2010 order telling plaintiffs that they

22  have to provide the case-specific facts.

23          Plaintiffs' motion for an extension of time to

24  respond, Your Honor, cites an undisclosed scheduling conflict

25  and asks for another month.  They've already had two weeks

1  since the time we filed our motion to get a response on file.

2  They've not done that.  With an undisclosed scheduling

3  conflict that apparently prevents every lawyer at seven

4  different law firms, representing twenty-some plaintiffs, from

5  responding to any of this until two, three weeks after their

6  expert reports are due, I think just proves the point.  I

7  think we're caught in some gamesmanship here and we're --

8          THE COURT:  Mr. Denton, how about it?  When are we

9  going to -- I mean, what we're talking about now is your

10  response to the motion before I can even get to it.  I mean,

11  you know my predisposition.  I'm not going to treat this case

12  any different than I would any other.  You have the right to

13  respond, but you know, it's not going to take you six more

14  weeks to write a response to this.

15      MR. DENTON:  Well, the reason for that, Your Honor,

16  is, is that all of those firms are in seven-day-a-week mode

17  trying to get these expert reports done.  That's what this is,

18  and we see the timing of this frankly from our perspective in

19  teeing this up in July, when it was apparently, from their

20  view, ripe in January or February, is nothing but a

21  distraction from us getting our work at hand.

22          We would like to, if we have to deal with this, get

23  the reports done and then deal with it because it will take

24  time to respond to every single one of these, and I can tell

25  you that those firms are working seven days week.  We had a

18

1   meeting Sunday, all day Sunday on experts, and different

2   things vetting certain things, and so it is a process we are

3   very much engaged in, and you know, I'd tell the Court that

4   over the last couple of years we've had many, many times where

5   the defendant has asked for months, if not longer, to respond

6   to discovery matters.  And so I don't think this is

7   unreasonable under the circumstances.

8           THE COURT:  I'm not even talking about responding to

9   the discovery.  The question on the table now is your response

10  to their motion.

11          MR. DENTON:  Okay.

12          THE COURT:  I mean, this is putting a little sand in

13  the cogs here, because if you wish to be heard on their

14  motion, you have to be heard on their motion.  Only then can I

15  tell you what the scope of your response needs to be.

16          MR. DENTON:  Correct.

17          THE COURT:  I mean, you already have a theory about

18  why you shouldn't have to answer these interrogatories or why

19  your answers are sufficient or what it is you're going to do

20  to fix it.

21          MR. DENTON:  Correct.

22          THE COURT:  That's a little different than providing

23  all the information.  I assume you're kind of conceding that

24  there needs to be more information provided to the defendant;

25  otherwise, this wouldn't be a big burden.  You just say, I win

1    because, and I don't have to answer this.

2            MR. DENTON:  Well, I think there is a burden on all

3    these firms.  And let me just tell you, Your Honor, I don't

4    think this is limited to the seven trial cases.  They've filed

5    this motion on all 24 cases.  So we have to -- is that

6    correct?

7            MS. KRAFT:  Yeah.  Definitely on the first motion

8    pertaining to reports on the Court's prior order, No. 3 of

9    their agenda.

10           THE COURT:  At a minimum, obviously, we have to focus

11   on the eight cases that have been teed up for trial.

12           MR. DENTON:  Right, right.  And that would be a

13   reduction of our response.  You know, if the Court is

14   asking --

15           THE COURT:  I'm at a loss as to why it would be

16   easier to respond to eight instead of twenty-three if your

17   view is, is that is a universal problem.

18           MR. DENTON:  Well, I think it is, but it also

19   involves other law firms, Your Honor, that I don't know what

20   their schedule is.  And I can't respond for another law firm

21   and their client as to what they want to do.  I can respond to

22   my clients, obviously, and I will do that.  You know, if the

23   Court would give us until next Friday to file a responsive

24   brief, we'll get it done somehow.

25           THE COURT:  Well, let's do it by next Friday.

Case: 4:08-md-01964-RWS   Doc. #: 1021   Filed: 07/21/11   Page: 20 of 41 PageID #: 18587

1          MR. DENTON:  All right.

2          THE COURT:  Then, obviously, I'll expect to hear from

3  Mr. Yoo as to whether you intend to file a reply or you deem

4  it submitted.  Let me know.  I assume you'll want to reply.

5  You've never been at a loss for words before.

6          MR. YOO:  Why don't we get our reply on file by the

7  following Thursday.

8          THE COURT:  Okay.  That will be helpful.

9          Okay.  Does this really overlap us into the fourth,

10  which is the motions -- I take it, Ms. Geist -- I'll wait.

11          MR. YOO:  Your Honor, No. 4 relates to the --

12          THE COURT:  All the material that was filed

13  yesterday?

14          MR. YOO:  Yeah.

15          THE COURT:  So we just have to take some time here.

16          MR. YOO:  Yeah.  I would assume that plaintiffs will

17  respond timely to those.

18          THE COURT:  And you'll reply.  And we may need to get

19  together sooner rather than later at some point; although,

20  with your expert schedule I'm not here to mess that up, but we

21  will find a time to get together to bring some of this to

22  closure.

23          MR. YOO:  Thank you, Your Honor.

24          THE COURT:  Motion for protective order regarding

25  certain requests for admissions.

1        MR. BALL:  Yeah, Your Honor.  We have had some

2    discussions, Roger and I have had, about this issue.  Here's

3    what the background is briefly.  You may recall in May there

4    was a discussion about foundation for certain company

5    documents and there was some discussion about how we're going

6    to go about doing that.  We are not going to just give a

7    blanket agreement that every single document is a business

8    record admissible, et cetera.  So the plaintiffs filed over a

9    thousand requests for admissions.  We are endeavoring to

10   respond to over a thousand of them.  We have approximately a

11   hundred and something that are set forth in the motion that we

12   are asking the plaintiff to withdraw or the court to strike as

13   a part of our protective order and here's why.

14        The other thousand that are not the subject of the

15   motion essentially are one or two or three pieces of paper or

16   maybe ten pages, or something like that, and we're responding

17   to those.

18        The ones that are subject to this motion, they have

19   hundreds, thousands, tens of thousands, hundreds of thousands,

20   or --

21        THE COURT:  You want them to be more particularized

22   in their request?

23        MR. BALL:  Well, particularly when they get up to a

24   million.

25        THE COURT:  Right.

1    MR. BALL:  And I've had discussions with them about

2    this with Roger.  He has not said he won't withdraw them and

3    start over with these.  He hasn't said he will.  So we filed

4    the motion for protective order.  We have an extension, an

5    agreed extension, to the end of this month to respond to the

6    other thousand, but we put this protective order on place with

7    the ones that are too burdensome and voluminous, and all we

8    ask is that they go through and actually identify the ones

9    that they really need responses to, and we'll respond as we

10   are in the others.

11    MR. DENTON:  Your Honor, I have been working with

12   them and I, frankly, gave them an extension of time

13   voluntarily, so I just want that out there.  But there are a

14   couple of things that are problematic here.  It would seem to

15   me that -- some of these are large, but they're categorized in

16   a custodian file; so Dr. So-and-So, this is her custodial

17   file, and these are the documents from that file.

18        A couple of things ought to be self-evident:  One,

19   that any copy they produce to us should be authentic; and two,

20   they should be willing to admit that they came from that

21   custodial's file.  That's a blanket, generic, across the board

22   and some of these files are very large, but we shouldn't need

23   to, in those, to go document by document.  And that's

24   problematic, and we sent an amended request to clarify some of

25   that.

1          Other things like the NDA, the submission to the FDA,

2     very, very large file.  This should not be one that we have a

3     problem with even though there's many pages.  There is what

4     you submitted, this is authentic, and was done.

5          In fact, this is typically done in litigation when

6     the documents are produced that there's a verification that

7     the documents are authentic copies and came from a certain

8     file.  They ought to be willing to do that.  To this day, they

9     have not agreed to do that.

10         Beyond that, if we have to go document by document as

11    to whether or not an e-mail sent from one high-level employee

12    to another high-level employee was in fact done in the

13    ordinary course of business at the time and date on that

14    e-mail to lay a business record foundation, I think that's

15    what they're suggesting that we do, and it just seems onerous.

16         And I'm willing to try to work with them to get

17    through this, but I don't want to be stuck with an obvious

18    document that should otherwise be admissible that we don't

19    have a proper foundation and have an objection.  And frankly,

20    I'm trying to avert this before we are, you know, a few months

21    before trial, because if there are legitimate objections they

22    raise, I may need to take, and would take, a foundation-type

23    deposition.

24         And I want this sorted out now, not months from now.

25    And so we need to try to work through that, but I don't know

1    if I go through and, for example, take the extreme and have a

2    separate request for admission for all one point million

3    documents, does that solve any problem?

4           If that's what they want, we can go through that

5    exercise, but it seems to me the substantive issues are still

6    there.  So we need to resolve this and I think that what we

7    have done is appropriate.  We still haven't briefed this

8    motion and we still haven't seen their responses to the ones

9    that they are going to respond to, and perhaps that would give

10   me some sense of where we're at because there's a large

11   number, I think, documents that were marked as exhibits in

12   deposition that I believe they were going to respond to, as I

13   understand, so we can see where we're at.

14          But I'm trying to not have a hiccup or a problem at

15   the time of trial.  I'm trying to do this proactively.  And

16   you know, we're entitled to know if there is going to be a

17   business record objection to certain documents, and I don't

18   know how else to do it.

19          MR. BALL:  I can help.

20          THE COURT:  Mr. Ball knows how to do it.

21          MR. BALL:  First of all, it's just sit down and

22   decide which documents you're going to be using at trial.

23          THE COURT:  You know --

24          MR. BALL:  I mean, a million documents -- a million

25   pages in one request is ridiculous.

 1          THE COURT:  No.  Look, a million pages is too much.

 2    We all agree.

 3          MR. BALL:  No --

 4          THE COURT:  I would much rather -- look, you're not

 5    going to have a discussion among yourselves while I'm here.

 6    You can do that when I'm gone.  It's always good to talk, but

 7    there's no reason to fuss, all right?

 8          We agree.  A million pages is too much.  The example

 9    of the NDA is a good one.  You either admit that's what you

10    submitted to the FDA or it's not.  Now, that is a tedious

11    task, but you probably did it at the beginning when you

12    produced it and now you just need to verify that what he's

13    identified -- you identified in those Bates stamps are still

14    the Bates stamps everybody is using and in fact that's what it

15    is.  And I suspect you'd much rather have Ms. Geist, or I

16    assume you've locked Ms. Weissman in some basement somewhere

17    in California, making that decision than have him take a

18    deposition of somebody at the company and go through it with

19    them.  You don't want to do that.

20          MR. BALL:  No.

21          THE COURT:  So you have a meeting of interests here.

22          MR. BALL:  That's not the issue.  The issue is, with

23    all due respect to Roger --

24          THE COURT:  Oh, oh, oh, you just tripped over the

25    trap door, okay?  Any sentence that starts with "with all due

1   respect" is a very, very bad one.

2          MR. BALL:  Then I withdraw that.  Nothing was wrong

3   about what he was saying.

4          THE COURT:  Nothing good comes after "with all due

5   respect."  You might as well call him a name and move on.

6          MR. BALL:  He didn't quite appropriately say what his

7   requests say.  His requests don't say, please admit this is

8   the custodial file of Joe Smith.  They ask us every single

9   document's authentic, every single document was prepared in

10  the ordinary course of business, every single document was

11  prepared by a person with knowledge of the events at the time

12  and the opinions stated in there are accurate.  That's -- so

13  that's the problem.

14         THE COURT:  Mr. Denton, why don't we approach.  We

15  can solve this right now.  I'll save you writing a response.

16  You understand the point, too.  His point is well taken.

17         MR. DENTON:  Well, I understand that, but he's not --

18  apparently hasn't read the amended request that we sent him a

19  week ago.

20         MR. BALL:  I have no knowledge of any amended

21  request.  I have knowledge of requests that you sent in the

22  state court cases that are better but not there, but I have no

23  knowledge of --

24         THE COURT:  Okay.  So you need to send out an amended

25  request if you haven't otherwise.  So if you haven't already,

1    you're going to send out an amended request.  With all due

2    respect, Mr. Ball.

3              MR. DENTON:  Absolutely.  But they've been identical

4    in every case.  And for them to suggest --

5              MR. BALL:  No, no, no, Roger.  I'm sorry.  The MDL is

6    different than --

7              THE COURT:  I think that you all can work this out

8    because, you know, a million is too many.  Mr. Ball feels

9    strongly that a million is too many.  Mr. Ball also knows he

10   doesn't want you taking depositions of random people to

11   authenticate these documents if you haven't already done so,

12   and you just need to identify by custodial files or other

13   discrete categories these records, and then we'll get it done.

14             MR. DENTON:  Okay.

15             THE COURT:  And if you need to do amended requests,

16   and if you haven't already done so -- because apparently Judge

17   Martinotti feels pretty oppressed by your document production

18   issues.

19             MR. DENTON:  I don't know.  I have not appeared in

20   front of Judge Martinotti, so I can't answer that, Your Honor.

21             THE COURT:  Maybe you haven't had the pleasure.

22             MR. DENTON:  Oh, I've been in front of him one time

23   early on, but not recently.

24             THE COURT:  Off the record.

25                   **(DISCUSSION OFF THE RECORD.)**

Case: 4:08-md-01964-RWS  Doc. #: 1021  Filed: 07/21/11  Page: 28 of 41  PageID #: 18595

1          THE COURT:  We're back on the record.  Use of

2    treating physicians as experts and consultants.  By the way,

3    what did you do to Ms. Weissman?

4          MS. GEIST:  She has moved on to other matters, Your

5    Honor.

6          THE COURT:  Okay.

7          MS. GEIST:  She's not in the basement, Your Honor.

8          THE COURT:  I thought you locked her in the boiler

9    room.

10          MR. YOO:  Your Honor, Issue No. 6 relates to our

11    consulting with a physician in the medical community as an

12    expert.  It turns out he treated one of the plaintiffs in the

13    litigation.  We have not discussed with the doctor any issues

14    relating to that plaintiff.  We have not invaded the

15    physician-patient privilege.  But as a professional courtesy,

16    and to avoid any misunderstanding down the road, we alerted

17    Mr. Denton to the situation but, apparently, we're not seeing

18    eye to eye.  Plaintiffs object to our consulting with anyone

19    who has treated any plaintiff on the litigation.

20          We think that's unfair.  We can't be hamstrung from

21    meeting with perspective experts.  We don't intend to discuss

22    ex parte any issues relating to a patient of theirs who

23    happens to be a plaintiff in the litigation.  So we don't

24    think we're doing anything wrong, but since the issue has come

25    up, we wanted to raise it for the Court's attention.

```
 1              THE COURT:  All right.  Mr. Denton?

 2              MR. DENTON:  Your Honor, I was somewhat surprised

 3     this was on the agenda because there's no pending motion, but

 4     Mr. Ball did send me an e-mail to this effect, I want to say,

 5     seven to ten days ago.  I told him that we strongly object to

 6     it, there's case law on it, and it needs to be handled.  But

 7     there are a number of cases that would preclude this.  In

 8     short, Your Honor --

 9              THE COURT:  This is easy then.  I'm going to give you

10     each ten days to file simultaneous briefs with me about what I

11     should do.  We agree that you've -- you know, we're seeking to

12     retain as an expert a physician who treated one of the

13     plaintiffs, right?  But nobody has tripped over the Chinese

14     wall of any knowledge about the individual plaintiff, so what

15     is the consequence or result?  And I don't think that's --

16     there's no reason to do back and forth.  I assume you want to

17     know sooner rather than later.

18              MR. YOO:  That's fine, Your Honor.

19              THE COURT:  Why don't we do simultaneous briefs in

20     ten days.  If someone feels, oh, my gosh, I really got to

21     respond to that, which I suspect will happen, file a quick

22     motion and within the week, you know, ten days to brief it,

23     seven days to respond.  I'll take it as submitted within three

24     weeks.  How's that?

25              MR. YOO:  Thank you, Your Honor.
```

1    THE COURT:  That brings us to replacing of dismissed

2    MDL trial pool cases.  We haven't lost any of our final eight,

3    have we?

4    MS. GEIST:  No, Your Honor.  We have not.  The final

5    eight remain, at least at this point, in the litigation.  Our

6    concern is, Your Honor, there is now an imbalance in the

7    inventory of bellwether cases.  As the Court is aware, we

8    started off with 25 cases.  We spent a long time discussing

9    this with Your Honor that this would be the appropriate number

10   to ensure that as we move forward in the litigation and cases

11   necessarily drop out due to motions, or for whatever other

12   reason, we have enough cases worked up so that we don't need

13   to go back to the beginning.

14   We have lost three cases on the defense side -- the

15   Easter Brown, Jennifer Anderson, and Sherrika James case.  So

16   at this point, Your Honor, when you look back at the pool of

17   cases in the bellwether inventory, there's an imbalance.

18   There are three less defense picks originally.  So what we

19   would like to do, Your Honor --

20   THE COURT:  The thing that I would be most angst

21   about is whether they were all stroke cases, DVTs, or what

22   were the nature of the injury alleged, because one of my

23   greater concerns is if the cases reflect a cross section of

24   the results.  You know, we'd all end up with all stroke cases

25   in the end, and that makes it impossible to have any jury

1    experience with a DVT or a heart attack.  Do you follow me?

2              MS. GEIST:  I do, Your Honor.  I do.  I'd have to

3    actually look up, Your Honor, which injuries are alleged in

4    those cases.

5              THE COURT:  Anyway, what was your proposal?  I cut

6    you off.

7              MS. GEIST:  The proposal is simply this, Your Honor.

8    We have had this same issue come up before Judge Martinotti in

9    New Jersey, and when the cases dropped out, we've simply, as a

10   matter of course, been able to substitute in a new defense

11   pick.  So our proposal, Your Honor, would be simply that, that

12   we go ahead and substitute in three new defense picks in the

13   bellwether pool.  We would work up those cases in terms of the

14   discovery.  Those would be outside of the eight trial pool

15   cases that are being worked up now for expert discovery.

16             THE COURT:  Any response?

17             MR. DENTON:  Again, Your Honor, I had no knowledge

18   this was going to be on the agenda until I saw it late

19   yesterday, so I would like --

20             THE COURT:  Do you think this is something you can

21   work out?

22             MR. DENTON:  Oh, certainly, we'll talk to them.

23             THE COURT:  It certainly sounds on its face, without

24   thinking about -- oh, I'm sure you're sitting there thinking

25   of all the nefarious things Ms. Geist must be up to, but

1   there's a way -- I mean, it would be whoever lost a case would

2   substitute a case.

3           MR. DENTON:  Except my -- I have no problem with

4   that, but at this point let's focus on the seven that we have

5   worked up for trial instead of adding three more in for

6   discovery for whenever, many years from now.  It just seems

7   like this isn't the time to take that up.  There may be an

8   appropriate time, and there may be an appropriate proposal

9   that makes sense, but none of those three cases are with my

10  firm, as I don't recognize those names, I don't know the

11  nature of those cases, and we'd like to be able to discuss it

12  with them.  But the timing, it seems inefficient to be doing

13  case-specific discovery on three new cases.

14          THE COURT:  It also seems inefficient to stop, to be

15  honest.

16          MR. DENTON:  For what purpose, Judge?  I mean --

17          THE COURT:  To continue the progress.

18          MR. DENTON:  We've got seven cases in the queue that

19  have to get tried before we get to whatever this next group

20  is.  That will be years from now, I believe, if we try them

21  all.  Certainly more than a year from now.  So why the

22  expense?  What's the purpose of that at this point in time?

23          THE COURT:  I'll give you the same thing, each ten

24  days to tell me what you think we should do about cases as

25  they fall out, if you will, of the bellwether category.  And

1    either you're going to agree or I'll pick one or the other.

2          We're going to take a short recess.  We've gone

3    through the agenda, but there was the one pending motion on

4    redaction.  I don't know if you intended to take that up today

5    or if you've resolved that.

6          MS. GEIST:  Your Honor, I believe that's pending.

7    That is not our motion.  That is plaintiffs' motion that was

8    on the agenda.

9          MR. DENTON:  I'll be happy to take it up today, Your

10   Honor.

11         THE COURT:  We'll reconvene in about five minutes.

12         **(COURT RECESSED FROM 11:15 AM UNTIL 11:22 AM.)**

13         THE COURT:  So Ms. Kraft and Mr. Strauss, what were

14   you working on?

15         MR. STRAUSS:  We were working on the --

16         THE COURT:  You got to go to the podium or it didn't

17   happen.  You know the rule of the room.

18         MR. STRAUSS:  Yes, sir, Your Honor.  Ms. Kraft and I

19   were working on potential resolutions to the request for

20   admissions with respect to authenticity of documents in the

21   large swath of documents versus custodial files and the like,

22   and we're going to continue working on that, but we think we

23   have some progress.

24         THE COURT:  That's certainly workable outable.

25         MR. STRAUSS:  Yep.

Case: 4:08-md-01964-RWS  Doc. #: 4024  Filed: 07/21/11  Page: 34 of 41 PageID #: 18601

 1          THE COURT:  All right.  Want to take up the redaction

 2    issue?  I mean, it's fully briefed.

 3          MR. DENTON:  Correct, Your Honor.

 4          MS. GEIST:  Your Honor --

 5          THE COURT:  But Ms. Geist has a thought.

 6          MS. GEIST:  That would be my motion, Your Honor,

 7    certainly because it falls in the purview of documents.  I

 8    don't have the briefs with me, Your Honor.  I was certainly

 9    not prepared because it wasn't an agenda item.  So I apologize

10    to the Court, but I was not prepared.

11          THE COURT:  All right.  Since it wasn't on the

12    agenda, I'm hard put to force the issue.

13          MR. DENTON:  I'm not asking.

14          THE COURT:  As much as I hate to write, I'd much

15    rather talk.

16          MR. DENTON:  I would rather talk as well, but if

17    you'd like to write an order on that, that would be fine.

18    It's fully submitted.

19          THE COURT:  Maybe we'll get together sooner rather

20    than later to work through, because sometimes the nuances can

21    come out in a conversation that aren't as obvious in the

22    written page, too, that --

23          MR. DENTON:  Okay.

24          THE COURT:  There were a couple other things that I

25    saw in the open motions list that I wanted to clean up if we

1   could.

2          Why don't you tell me, Ms. Geist, where are you with

3   Judge Martinotti, because the motion on redactions in New

4   Jersey is different than the motion on the redactions here.

5          MS. GEIST:  You're absolutely correct, Your Honor.

6   It is.  Here in the MDL, Your Honor, my recollection is that

7   the motion is seeking sort of --

8          THE COURT:  Prospective.

9          MS. GEIST:  Prospective relief only, correct.  And in

10  New Jersey the relief is different.  The plaintiffs' counsel

11  there is asking for sort of a redo of the entire production to

12  date.  That is my general understanding of the difference.

13         THE COURT:  That alone would be an MDL for heart

14  attacks, asking you to go back and redo the document

15  production in this case.

16         MS. GEIST:  Yeah.  I think we've already revisited

17  that issue, Your Honor, concluded that that would not be a

18  good idea.  It would certainly hold things up.

19         THE COURT:  Is that fully briefed in front of Judge

20  Martinotti?

21         MS. GEIST:  It is fully briefed, Your Honor.  Judge

22  Martinotti held oral argument on that motion and two other

23  pending discovery motions that had been filed by plaintiffs'

24  counsel by telephone.  He followed up and asked for a copy of

25  the transcript of that oral argument on those three motions,

1    and I'm hopeful that he will provide us with his decision and

2    insight either before or during the case management conference

3    that we have in New Jersey next Wednesday, July 20.

4         THE COURT:  Why don't you all let me know what Judge

5    Martinotti does next Wednesday because that may make this

6    moot.  I mean, if he rules against you, obviously I'm the

7    least of your concerns at that point.  Fair?

8         MS. GEIST:  We're happy to do that, Your Honor.

9    Thank you.

10         THE COURT:  We'll see where we are.

11         There's the one case that there was -- we finally got

12   to a protocol for what to do when plaintiff fact sheets aren't

13   filed, and it's very clear this is what's going to happen,

14   don't wonder, and then we dismissed Isakson, and there was a

15   motion for extension of time to provide that fact sheet and no

16   one responded on behalf of the defendant.  So should I just

17   grant that?  Are you familiar with that case?

18         MS. GEIST:  Your Honor, I am familiar with the case.

19   My understanding, I believe it is a case being handled by Mr.

20   Rheingold who's not here today, but my recollection is that

21   things had simply crossed and he had in fact provided or was

22   in the process of providing us with a fact sheet.  So I agreed

23   that we would not oppose his motion.

24         THE COURT:  All right.

25         MR. RHEINGOLD:  Your Honor, it's Paul Rheingold.  I

1    evidently had the time wrong because I thought the conference

2    was just going to start, but I did hear Ms. Geist, and that's

3    correct.

4             THE COURT:  All right.  Very good.

5             And do I have any -- we did a briefing schedule on

6    the motion -- are there any protective orders that we haven't

7    said here's when you're going to file your responses, and so

8    it will be at issue?

9             MR. DENTON:  I think you directed us on all of them.

10            THE COURT:  Did I miss anything?

11            MR. BALL:  One involving request for admissions by

12   rule you haven't --

13            THE COURT:  Yeah.  That was just filed yesterday.

14   There was no reason for me to mix that up.

15            MR. DENTON:  Correct, correct.

16            THE COURT:  Okay.  Oh, you're going to work out the

17   issue as to the authentication of the documents.  I didn't

18   give you a timetable for that, I don't think.  That's the one

19   that I don't have a backstop for.  Do you follow me?

20            MR. BALL:  I believe that the plaintiffs are okay

21   with this; that while we continue to work on that issue, we

22   are not going to respond to those paragraphs that are the

23   subject of the motion for protective order, true?

24            MR. DENTON:  That's true.

25            MR. BALL:  And then so I guess that motion for

1  protective order can be granted until we come up with a

2  proposal to deal with --

3         THE COURT:  Well, I'm not going to do anything with

4  the motion.

5         MR. DENTON:  I haven't responded to it yet.

6         THE COURT:  The only thing I'll assure you of,

7  though, is next time we get together if it's not resolved,

8  we're going to take it up and resolve it.

9         MR. BALL:  There you go.

10        MR. DENTON:  That's very reasonable.

11        MR. BALL:  That's fine.  And in the meantime, we can

12  respond to the request for admissions.  Okay.

13        THE COURT:  So not to be difficult in the expert

14  discovery phase, when is a good time for us to get back

15  together?  It strikes me we do need to get together in the

16  next four to six weeks.

17        MR. BALL:  We were going to suggest the week of

18  August 15, by phone.

19        THE COURT:  Monday or Tuesday I'll be at the Eighth

20  Circuit conference in South Dakota.  We go to such glorious

21  places.

22        MR. BALL:  Then later, if we do it later in the week,

23  we can do it, but --

24        THE COURT:  I'm available Thursday and Friday that

25  week.

```
 1            MR. BALL:  How about Thursday afternoon of that week,

 2   which would be the --

 3            THE COURT:  1:30 central?

 4            MR. BALL:  That would be good for us.

 5            THE COURT:  1:30 central.

 6            MR. BALL:  What is that?

 7            THE COURT:  The 18th.

 8            MR. BALL:  Is that okay?

 9            MR. DENTON:  I'll make it work, Your Honor.  We'll

10   make it work somehow.

11            THE COURT:  Our next status conference will be 1:30

12   central on the 18th, and we'll take it from there.  Anything

13   else while we are together?  Telephone conference, correct?

14   Okay.  Anything further?

15            MR. DENTON:  I don't think so, Your Honor.  I wasn't

16   clear if that on the 18th was by phone or in person.  I would

17   prefer by phone.

18            THE COURT:  They recommended by phone.  I heard

19   telephone.

20            MR. DENTON:  I did, too.  I just wanted to clarify.

21            MS. GEIST:  Your Honor, would anybody object to 2:30

22   central?  Would anybody object?

23            MR. DENTON:  Not by phone.

24            THE COURT:  2:30 central.

25            MS. GEIST:  Thank you, Your Honor.
```

Case: 4:08-md-01964-RWS   Doc. #: 1021   Filed: 07/21/11   Page: 40 of 41 PageID #: 18607

1          THE COURT:  It just interrupts Mr. Yoo's lunch hour,

2    that's all.

3          MR. YOO:  We have nothing else for today, Your Honor.

4    Thank you very much.

5          THE COURT:  I still need to have a hearing held in

6    Muskogee before this is over, you know that.

7          MR. YOO:  Sure.

8          THE COURT:  Thank you all very much.

9          **(PROCEEDINGS CONCLUDED AT 11:35 AM.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

    I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

    I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

    I further certify that this transcript contains pages 1 through 41 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

    Dated at St. Louis, Missouri, this 21st day of July, 2011.


_____
/s/Shannon L. White
Shannon L. White, RMR, CRR, CCR, CSR
Official Court Reporter