UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: NUVARING PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | 4:08 MDL 1964 RWS<br><br>ALL CASES |

## SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING THE ALLOCATION AND DISTRIBUTION OF COMMON BENEFIT FEES AND EXPENSES

On June 25, 2014, this Court appointed Daniel J. Stack, as Special Master, to provide a Report and Recommendation to this Court for the allocation and distribution of common benefit fees and expenses. *See* Order Regarding Qualified Settlement Fund ("QSF Order") [Doc. 1718]. In this regard, the Special Master hereby reports as follows:

## BACKGROUND

This multi-district litigation ("MDL") was centralized into this Court by the Transfer Order of the Judicial Panel for Multi-District Litigation ("JPML") entered on August 22, 2008. From that date, until a Master Settlement Agreement was reached on February 7, 2014, a number of attorneys performed an extraordinary amount of work and advanced substantial expenses which benefited all plaintiffs and claimants who asserted NuvaRing related injuries against the defendants. These "common benefit attorneys" should and must be compensated for their efforts.

In order to provide a mechanism to compensate attorneys who performed

work for "the common benefit of all plaintiffs in this complex litigation" and to reimburse those attorneys for common benefit costs and expenses, this Court entered several orders setting forth guidelines and "holdbacks" to create a common benefit fund. *See* Amended Case Management Order No. 3 ("Common Benefit Order") at 3 [Doc. 1129]. In its Common Benefit Order, this Court also provided that no amounts will be disbursed without approval by the Court *or* such other mechanism as the Court may order. *Id.* at 6. On June 25, 2014, this Court set forth the details of the mechanism to be employed for distribution of the common benefit funds. [QSF Order, Doc. 1718]. Specifically, Liaison Counsel was ordered to submit to the Special Master a detailed summary of all common benefit time and expenses, noting any issues with such submissions, in applying this Court's guidelines set forth in the Common Benefit Order. Thereafter, the Special Master was to make recommendations, with input from Co-Lead Counsel, focusing on the quality of the work performed as well as the value of the work performed that achieved the global settlement, and that simply multiplying the hours logged by a rate (although to be considered) would not be controlling of the fee recommendation. Moreover, the Special Master was directed to mediate any objections to his proposed common benefit distributions. This work has been substantially completed.

## COMMON BENEFIT FEE AND EXPENSE DOCTRINE

The Supreme Court, over 100 years ago, approved the common benefit doctrine, which provides that when the efforts of a litigant or attorney preserve, protect, increase, or discover a common fund, all who benefit from the fund must

2

contribute proportionately to the costs of the litigation. *See Boeing, Co. v. Van Gemert*, 444 U.S. 472 at 479 (1980); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 at 123 (1885); *Trustees v. Greenough*, 105 U.S. 527 at 532-33 (1881). The common benefit doctrine recognizes a federal court's inherent authority, in the exercise of its equity jurisdiction, to prevent unjust enrichment by those who benefit from the efforts of counsel whose risk, investment, and effort generates, enhances, or protects a fund or benefit enjoyed by such beneficiaries.

The common benefit doctrine has been approved and implemented in dozens, if not hundreds, of multidistrict litigations, including, among others, *Phipps Group v. Downing (In re Genetically Modified Rice Litig.)*, 764 F.3d 864 (8th Cir. 2014); *In re: Sulzer Orthopedics, Inc.; Weitz & Luxenberg, P.C.; Lopez, Hodes, et al v. Sulzer Orthopedics, Inc.*, 268 F. Supp. 2d 907, *aff'd.* 398 F.3d 778 (6th Cir. 2005); *In re Oral Sodium Phosphate Solution-Based Products Liability Action*, 2010 U.S. Dist. LEXIS 128371 (N.D. Ohio 2010); *In re Vioxx Products Liability Litigation*, 760 F. Supp. 2d 640 (E.D. La. 2010); *In re Medtronic Inc.*, No. 05-1726, 2008, U.S. Dist. LEXIS 110259 (D. Minn. Oct. 20, 2008), *adopted by*, 2008 U.S. Dist. LEXIS 110214 (D. Minn., Nov. 10, 2008).

This Court has already found that it has the inherent power to award common benefit fees in this litigation. In its Common Benefit Order, this Court established the Common Benefit Fund, stating:

> The instant Order shall provide for the fair and equitable sharing among Plaintiffs of the cost of special services performed and expenses incurred by attorneys acting for MDL administration and the common benefit of all plaintiffs in this complex litigation. This Court's

authority derives from the Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881); refined in, *inter alia, Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); and approved and implemented in the MDL context, in, *inter alia, In re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

Common Benefit Order at 1, [Doc. 1129].

In the Eighth Circuit, use of the percentage of the fund method when awarding attorneys' fees in a common fund case "is not only approved, but also 'well established.'" *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (citing *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999). Courts may then choose to use the lodestar method to cross-check the fairness of a percentage of the fund award. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 at 1157 (8th Cir. 1999) (noting that the lodestar method is sometimes warranted to double check the result of the percentage of the fund method).

In the Common Benefit Order, this Court provided for an 11% holdback for common benefit attorneys' fees and 4.5% expenses. In this Court's Qualified Settlement Fund Order, it was directed that the 11% fee holdback and the 4.5% expense holdback be allocated separately from the claimants' fund. This order also set forth the mechanism to determine allocations among the common benefit attorneys. Taking into account the work performed by the common benefit attorneys and the result obtained, 11% of the total settlement fund of $100,000,000 is a very reasonable amount for the common fund attorneys' fees, and so is the 4.5%

4

for the reasonable and necessary expenses.

This percentage is well within the percentages that courts have routinely awarded in similar cases.[1] For example, in *In re Orthopedic Bone Screw Products Liability Litigation*, MDL No. 1014, 2000 U.S. Dist. LEXIS 15980 (E.D. Pa Oct. 23, 2000), the Court awarded a 12% fee to plaintiffs' attorneys on a $100 million settlement, finding the amount to be "modest, reasonable and in line with awards received in similar cases." *Id.* at * 32. Similarly, in *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 864-67 (E.D. La. 2007), the Court awarded attorneys' fees in the amount of 17% of the $195 million common fund obtained.

Common benefit attorneys have spent 34,440 hours of time from the inception of the MDL until the global settlement was announced.[2] Co-Lead Counsel, and in particular Liaison Counsel, continue to work for the benefit of all plaintiffs and claimants to administer the settlement program and to perform all necessary duties to conclude this MDL. Also, a few firms continue to provide work for the claims process.

---

[1] As a general rule, common benefit attorney fees awarded under the percentage method often are between 25% and 30% of the settlement fund. Manual for Complex Litigation at §14.121 (4th ed. 2012). In "mega-cases" in which large settlements or judgments serve as the basis for calculating a percentage, courts typically find lower percentages appropriate. One court's survey of fee awards in class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%. *Id.* (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 339 (3d Cir. 1998). See also, *In re Oral Sodium Phosphate Solution-Based Products Liability Action*, 2010 U.S. Dist. LEXIS 128371 at n. 10 (N.D. Ohio 2010) (making similar observations – a survey of common benefit fee awards entered in state and federal court in 1,120 class action cases found percentages of the total recovery of common benefit awards (both fees and expenses) average 18.4% across all 1,120 cases.

[2] This is the audited amount of time approved by the Special Master after his review of the total hours submitted, which exceeded 44,000 hours of attorney and paralegal time from the inception of this litigation through the date of settlement.

When this litigation began, there was an enormous amount of uncertainty as to whether plaintiffs would be able to obtain any financial recovery. Organon and Merck strongly defended themselves throughout this litigation with highly regarded, aggressive, and tenacious legal counsel. Certain attorneys invested enormous amounts of time and money into litigating this case without any certainty of recovery. As a result, they took on a substantial risk that they would receive nothing if the litigation was unsuccessful. In fact, as this litigation progressed, the riskiness of the case increased. For example, all Bellwether cases in the initial wave in the New Jersey state court litigation ended with summary judgment being entered in favor of the defendants or the cases were voluntarily dismissed with prejudice. While the Bellwether case in the MDL survived summary judgment, the risk of losing at trial or on appeal remained. The global settlement in this case removed the risk of continued litigation and what was certain to be years of additional litigation, and it provides compensation for the thousands of women who asserted injuries while using NuvaRing.[3] The result obtained from the fruits of certain attorneys' labor is extraordinary given the circumstances of this litigation.

Courts sometimes use the lodestar method as a cross-check to determine if the common fund award is reasonable. *See Petrovic*, 200 F.3d at 1157 ("the 'lodestar' approach is sometimes warranted to double-check the result of the 'percentage of the fund' method"). "The lodestar cross-check calculation need entail

---

[3] The Master Settlement Agreement ("MSA") included plaintiffs who brought suit in federal and state court and also included claimants who had not filed suit. Over 3600 women opted into the settlement program, which is more than 95% of the known claims at the time of the settlement.

6

neither mathematical precision nor bean-counting." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005). As stated by another court:

> The lodestar cross-check calculation need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross check need not scrutinize each time entry; reliance on representation by class counsel as to total hours may be sufficient. Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate.

*Turner*, 472 F. Supp. 2d at 867 (quoting Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judging Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 Geo. J. Legal Ethics 1453, 1463-64 (2005)). *See also, In re: Sulzer Orthopedics, Inc.: Weitz & Luxenberg, P.C.; Lopez, Hodes, et al v. Sulzer Orthopedics, Inc.*, 268 F. Supp. 2d 907 (N. Dist. Ohio), *aff'd* 398 F.3d 778 (6th Cir. 2005); *In re: Vioxx MDL 1657*, 760 F.Supp.2d 640 (E.D.L.A. 2001).

The common benefit attorneys and their staff have spent, in the aggregate, 34,440 hours prosecuting this litigation. A lodestar amount - the hours expended multiplied by each attorney's typical hourly rate -- would substantially exceed the holdback of $11,000,000. Given the circumstances of this litigation, it is my recommendation that this Court's 11% holdback should be distributed to the common benefit attorneys, as the amount is more than reasonable for the efforts expended and the results obtained[4]. In my recommended fee allocations, I assume that this Court will approve distribution of the entire 11% hold back for common

---

[4] I further note that all common benefit attorneys consented to this amount by executing a Participation Agreement. *See* Common Benefit Order, Exhibit A.

7

benefit attorneys.

The common fund doctrine also authorizes reimbursement of the reasonable amounts paid out-of-pocket to achieve a common benefit recovery or to advance the common goals of plaintiffs in MDL litigation. *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 15980 at *38-40 (awarding 4% of the gross recovery for reimbursement of litigation expenses); *See also Phipps Group v. Downing (In re Genetically Modified Rice Litig.)*, 764 F.3d 864 (8th Cir. 2014) (approving over $5,000,000 in expenses to the common benefit attorneys.).

This Court previously ordered that 4.5% of the settlement funds be held back and set aside for common benefit costs incurred by attorneys providing a common benefit, amounting to a total of $4,500,000. *See*, Common Benefit Order at 3, [Doc. 1129]; QSF Order at ¶ 2 [Doc. 1718]. To date, the common benefit attorneys have incurred an aggregate of approximately $3,000,000.00 in common benefit expenses. These expenses include, but are not limited to: housing all of the discovery produced by the parties to this litigation and making it searchable and accessible to all common benefit attorneys; travel costs for attending depositions around the Country and in Europe; expert fees and expenses; deposition transcript and video costs; hearing transcript costs; mediator fees and related costs; PSC group administration matters, such as meetings and conference calls and other litigation expenses. All the expenses that I recommend to be approved were incurred in the normal course of litigation and for the common benefit of all plaintiffs, and were reasonable and necessarily incurred. I also note that significant additional common

benefit expenses will be incurred for the further administration of the settlement[5], and therefore any excess expense funds should be maintained in the Common Benefit Fund, until the litigation is concluded, so that I can recommend to this Court that such additional expenses should be reimbursed at an appropriate time.

## ALLOCATION OF COMMON BENEFIT FEES AND EXPENSES

As directed by this Court, Liaison Counsel provided to the Special Master an organized and detailed accounting of all submitted time and expenses submissions from 21 different firms. Thereafter, the Special Master reviewed in painstaking detail all of these submissions, one entry at a time, which consumed an inordinate amount of time, because so many of the submissions were not in compliance with the guidelines set forth in the Common Benefit Order. [6]

*With respect to expenses*, the Special Master along with Liaison Counsel reviewed the expenses submitted by each common benefit attorney, ensuring that each request complied with this Court's direction, as set forth in the Common Benefit Order. Namely, payments only were allowed for:

1. Expenses incurred for the common benefit of all plaintiffs;

2. Expenses related to work authorized by the Plaintiffs' Executive Committee;

3. Expenses incurred prior to the formation of the MDL if it contributed

---

[5] These additional expenses include the Special Master's time to supervise the claims allocation process, expenses of those firms involved in the claims allocation process and other expenses for the administration of the MDL until this litigation is concluded.

[6] In its QSF Order, this Court set forth a deadline for the Special Master to complete his Report and Recommendation that could not be met given the problems associated with so many of the firms' time and expense submissions.

to the successful resolution of common liability, causation or damage issues, or otherwise advanced the litigation for the common benefit; and

4. Expenses that were properly reported and supported by appropriate documentation.

*See,* Common Benefit Order at 6-9 [Doc. 1129]. In addition, reimbursable expenses were adjusted, when necessary, to comply with this Court's limitations on travel and non-travel expense for reasonableness and unsupported expenses were disallowed. Thereafter, I reached out to every firm (with substantial help from Liaison Counsel) requesting that they provide appropriate explanations as well as documentation for all submitted expenses so that the expenses could be evaluated within the guidelines of the Common Benefit Order. Multiple letters, emails and telephone conversations were conducted with the Special Master and Liaison Counsel, and ultimately all firms consented to the Special Master's recommendation as to their share of the common benefit expenses.

***With respect to fees,*** I reviewed relevant case law and the methods employed by other Special Masters and district courts in similar MDLs and also followed the guidelines set forth in this Court's Common Benefit Order and QSF Order.[7]

---

[7] The Common Benefit Order defined "common benefit time" as "time spent on matters common to all claimants in MDL No. 1964." *See* Doc. 1129 at ¶ 2.a., p. 8. In other words, according to the Order, common benefit time includes service provided for the joint and common benefit of plaintiffs in addition to an individual client. *Id.* The Common Benefit Order further clarified that the fund would not be used to pay for services primarily related to a particular case or a case specific deposition or expert. Nor would the fund be used to pay for time spent preparing for an individual trial. Additionally, the time submissions (continued...)

In order to make a recommendation to this Court, I employed a procedure that was fair to all firms and gave them ample opportunity to voice their positions for their common benefit fee allocation. First, all common benefit attorneys were allowed to submit a written affidavit to the Special Master to support their time submissions and to advocate for the value added by their work for the common benefit that lead to the global settlement and to suggest a requested fee. The total aggregate of the initial fees requested exceeded $40,000,000. Second, the task of allocating the common benefit fees was extremely difficult and complicated by the fact that many firms submitted time reports that were not in compliance with the Common Benefit Order. For example, some firms' time submissions did not provide detailed explanations of the work done, some firms submitted time for work on their individual cases, others provided time that was duplicative, and others provided time that was clearly excessive for the task reported. Instead of rejecting the non-complying time reports out of hand, as some MDL judges have done, I painstakingly reviewed and audited all time submissions line by line. I then provided my audited time analysis to each firm and afforded each firm an opportunity to provide additional details in support of their submissions. As a result, my time analyses

---

were required to be kept contemporaneously with the work performed. The Order also noted that depending on the size of the fund, payments could be limited to a part of the value of the service performed. Pursuant to the instruction provided in the QSF Order, Liaison Counsel provided me with a summary of the timely submitted time submissions and noted any issues with the submissions in accordance with Amended Common Benefit Order 3. I then evaluated the time submissions by focusing my review on the "quality of work performed as well as the value the work generated." (¶ 5). In this regard, this Court directed me not to simply base my recommendations on multiplying the hours logged by a rate.

were adjusted where appropriate and maintained where appropriate.

However, even weeding out the time that I determined was inappropriate pursuant to the Common Benefit Order, I was left with fee claims that exceeded the holdback by more than 350%. Because the total fee claims far exceeded the holdback, I had to devise a method to fairly allocate each firms' request to "fit" within the limits of the Common Benefit Fund.

After reviewing extensive case law, I determined it was appropriate to employ a methodology that took into consideration, all time sheets, logged hours by timekeeper, years of practice, support staff, type of work,[8] significance of the work, authorization of the work, participation in generic liability depositions, the development of experts, arguments and presentations to the Court, and all relevant information of the value added by each contribution that lead to the global settlement. Where appropriate, I considered information that was harmful to the advancement of the litigation. Actions by certain attorneys caused the PSC to incur significant additional costs, were disruptive to the advancement of this litigation and have caused delay in the disbursement of settlement proceeds for all claimants. These types of negative consequences to the litigation as a whole are referred to as "common detriment," and a number of MDL courts have applied this factor to reduce fee requests. *See e.g. Oral Sodium, Phosphate*, MDL 2066, 2010 Lexis 128371 (N.D. Ohio, Judge Polster).

---

[8] In the various time submissions I determined that there was an inordinate amount of time submitted related to document review. In my methodology, I applied a flat rate per hour for document review and applied that rate to all firms uniformly.

I carefully reviewed the work performed by each firm in order to determine its quality and the value it generated towards the ultimate settlement, evaluating the substantive contribution of each attorney or law firm as compared to contributions of other attorneys or firms seeking common benefit fees. In doing so, I took into account: (1) the results obtained as a result of counsel's efforts, (2) the novelty and difficulty of the questions addressed by counsel, (3) the skill requisite to perform the legal work (4) the time and labor expended by counsel. These factors[9] helped assess the nature of the work performed by counsel, its relative importance, and its overall value to the ultimate resolution of the case.

For example, those attorneys who spent their time passively involved in meetings, reviewing emails, telephone conferences, or attending hearings to merely observe, were viewed as not having contributed to the common benefit on a level as high as those attorneys and firms who undertook more critical aspects of the litigation, such as (1) preparing for and taking generic liability depositions, (2) meeting and working with experts, (3) preparing experts for, and defending them during, their depositions, (4) presenting arguments before the Court, and (5) negotiating the ultimate settlement. I also looked at the length of each firm's involvement in the litigation, its overall time commitment to the case and whether attorneys in the firm assumed a leadership role.

Excessive billing for certain activities were considered and adjusted

---

[9] The factors considered by this Special Master parallel the factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714, 717-19 (5th Cir. 1974) and adopted by the Eighth Circuit in *Hardman v. Board of Education of Dollarway Arkansas School Dist.*, 714 F.2d 823, 825 (8th Cir. 1983). *See also Rice MDL 764* F.3d 864(8th Cir. 2014).

13

accordingly. Duplicative billing was eliminated as well as time submitted for work on individual cases. In accordance with this Court's instructions, I did not simply use the lodestar method to create a recommended allocation of common benefit fees. QSF Order at ¶5, [Doc. 1718]. Instead, the recommended allocations are based "on the quality of the work performed as well as the value the work generated that achieved the settlement." *Id.* The lodestar method was used, however, to crosscheck the allocation. Moreover, I discussed with defense counsel their views on the benefit and detriments of plaintiffs' counsel with respect to advancing the litigation. I also consulted with Co-Lead Counsel and gave due consideration to their recommendations as directed by this Court.

Based upon all of this work, I made an initial fee recommendation for each firm. All attorneys were afforded the opportunity to meet in person with the Special Master to explain their roles in the litigation, to advocate for their respective fees and to mediate a resolution. Many attorneys appeared in person; and others opted for telephone and email communications with the Special Master and certain firms accepted my initial recommendation. Thereafter, numerous discussions with firms were made in an attempt to reach a global consensus. The Special Master conducted subsequent in person and telephone mediations with the assistance of Co-Lead Counsel in an effort to mediate resolution of all claims. These extensive mediation efforts have resolved all objections to my fee allocations, and consents have been executed by those firms.[10] The allocations of fees and expenses is attached as

---

[10] A copy of all the consents are attached as Exhibit 2.

14

Exhibit 1, and for the detailed reasons set-forth above, I make the recommendation that this Court approve these allocations.

I also note that there has been and will be substantial work performed since the announcement of the global settlement until all claimants who are due compensation will be paid. Much time has been expended by a few attorneys to implement, monitor and conclude the settlement. This includes meeting with the claims administrator and monitoring their work, meetings with defense counsel, meetings with the Special Master, allocation of in excess of 3500 claims which requires detailed review of claim packages and review of medical records to allocate awards.[11] This work is substantial, important and necessary and should be compensated by the common benefit fund. In my recommendation, I have indicated that approximately $875,000.00 of the common benefit fee fund be held back to compensate those attorneys who continue to perform common benefit work, and to be reviewed by the Special Master with a subsequent recommendation to this Court for approval and disbursement at an appropriate time. All common benefit attorneys have consented to this hold back recommendation.

## CONCLUSION

For the reasons set forth above, the Special Master respectfully requests that this Court adopt his Report and Recommendation, including the following recommended order:

---

[11] I am substantially involved in the claims allocation process and administration of the settlement program. The MSA provides that I will serve as Special Master to approve all allocations, to hear appeals and to otherwise help conclude the settlement program.

1. To approve as fair and reasonable the aggregate amount of $11 million for work performed, and yet to be performed, by the common benefit attorneys;

2. To approve as fair and reasonable the aggregate amount of $4.5 million for reasonable and necessary common benefit expenses;

3. To approve the allocation of common benefit fees as set forth in Exhibit 1, and order that those funds be distributed from the Common Benefit Fund Account to those firms promptly;

4. To approve the reimbursement of common benefit expenses as set forth in Exhibit 1, and order that those amounts be distributed from the Common Benefit Fund promptly; and

5. To maintain the residual balances in the Common Benefit Fund until such time as the Special Master recommends to this Court an appropriate future distribution.

Respectfully submitted,    12-16-2014

Daniel J. Stack
Special Master